**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSEPH A. WILLIAMS, III<br>17930 Great Lakes Parkway<br>Hiram, Ohio 44234 | |
| | **COMPLAINT** |
| JOSEPH A. WILLIAMS, IV<br>17930 Great Lakes Parkway<br>Hiram, Ohio 44234 | |
| MARK A. WILLIAMS<br>17930 Great Lakes Parkway<br>Hiram, Ohio 44234 | |
| ELECTROLOCK INCORPORATED<br>17930 Great Lakes Parkway<br>Hiram, Ohio 44234 | |
| STONE RIVER MANAGEMENT CO.<br>17930 Great Lakes Parkway<br>Hiram, Ohio 44234 | |
| DUNSTONE CO.<br>17930 Great Lakes Parkway<br>Hiram, Ohio 44234 | |
| Plaintiffs, | |
| -v.- | |
| KATHLEEN SEBELIUS, in her official capacity<br>as Secretary of the United States Department of<br>Health and Human Services<br>200 Independence Avenue, SW<br>Washington, DC 20201 | |
| UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, SW<br>Washington, DC 20201 | |
| JACK LEW, in his official capacity as the<br>Secretary of the United States Department of the<br>Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington, DC 20220 | |

1

UNITED STATES DEPARTMENT OF THE
TREASURY
1500 Pennsylvania Avenue, NW
Washington, DC 20220

THOMAS PEREZ, in his official capacity as the
Secretary of the United States Department of
Labor
200 Constitution Avenue, NW
Washington, DC 20210

UNITED STATES DEPARTMENT OF LABOR
200 Constitution Avenue, NW
Washington, DC 20210

    Defendant.

Now come Plaintiffs Joseph A. Williams III, Joseph A. Williams IV, Mark A. Williams,

Electrolock Incorporated, Stone River Management Co., and Dunstone Co. (collectively

"Plaintiffs"), by and through undersigned counsel, and bring this Complaint against the above-

named Defendants, their employees, agents, and successors in office, and in support thereof state

the following upon information and belief:

## NATURE OF THE ACTION

1.   This is a case about religious freedom.  Thomas Jefferson, a Founding Father of

our country, principal author of the Declaration of Independence, and our third president, when

describing the construct of our Constitution proclaimed, "No provision in our Constitution ought

to be dearer to man than *that which protects the rights of conscience* against the enterprises of

the civil authority."  Letter from Thomas Jefferson, United States Office of the President, to the

Soc'y of the Methodist Episcopal Church at New London, Conn. (Feb. 4, 1809) *cited in People*

*v. Dejonge*, 442 Mich. 266, 278 (1993) (emphasis added).

2.   This is a challenge to regulations ostensibly issued under the "Patient Protection

and Affordable Care Act" (Pub. L. 111-148, March 23, 2010, 124 Stat. 119) and the "Health

Care and Education Reconciliation Act" (Pub. L. 111-152, March 30, 2010, 124 Stat. 1029) (collectively known and hereinafter referred to as the "Affordable Care Act") that force individuals to violate their deepest held religious beliefs.

3.    One of the provisions of the Affordable Care Act mandates that health plans "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" and directs the Secretary of the United States Department of Health and Human Services to determine what would constitute "preventive care" under the mandate. 42 U.S.C § 300gg–13(a)(4).

4.    Without notice of rulemaking or opportunity for public comment, the United States Department of Health and Human Services, the United States Department of Labor, and the United States Department of Treasury adopted the Institute of Medicine ("IOM") recommendations in full and promulgated an interim final rule ("the Mandate"), which requires that all "group health plan[s] and . . . health insurance issuer[s] offering group or individual health insurance coverage" provide all FDA-approved contraceptive methods and procedures. 76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130.

5.    The Mandate requires all insurance issuers (e.g. Humana Health Insurance) to provide abortion, sterilization, contraception, and abortifacients in all of its insurance plans, group and individual.

6.    Health Resources and Services Administration also issued guidelines adopting the IOM recommendations. (http://www.hrsa.gov/womensguidelines, last visited Sept. 3, 2013).

7.    Under the IOM guidelines, the Mandate requires *all* insurance insurers to provide abortion, because certain drugs and devices such as the "morning-after pill," "Plan B," and "ella"

come within the Mandate's and Health Resources and Services Administration's definition of "Food and Drug Administration-approved contraceptive methods" despite their known abortifacient mechanisms of action.

8.     The Mandate forces employers and individuals to violate their religious beliefs because it requires employers and individuals to pay for insurance from insurance issuers which fund and directly provide for drugs, devices, and services which violate their deeply held religious beliefs.

9.     Since under the Mandate all insurance issuers must provide what the United States Department of Health and Human Services has deemed "preventive care," employers and individuals are stripped of any choice between insurance issuers or insurance plans to avoid violating their religious beliefs.

10.     The United States Department of Health and Human Services in an unprecedented despoiling of religious rights is forcing religious employers and individuals, who believe that funding and providing for abortion, sterilization, and contraception, and abortifacients is wrong, to participate in acts that violate their beliefs and their conscience—or be forced out of the health insurance market in its entirety in order to comply with their religious beliefs.

11.     Plaintiffs seek a Preliminary Injunction and Permanent Injunction, enjoining Defendants from implementing and enforcing provisions of the regulations promulgated under the Affordable Care Act, specifically the Mandate.  The Mandate violates Plaintiffs' rights to the free exercise of religion and the freedom of speech under the First Amendment to the United States Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act.

12.     Plaintiffs also seek a Declaratory Judgment that the regulations promulgated under the Affordable Care Act, specifically the Mandate, violate Plaintiffs' rights to the free exercise of religion and the freedom of speech under the First Amendment to the United States Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act.

13.     The Affordable Care Act's abortion, sterilization, contraception, and abortifacient mandate violates the rights of Plaintiffs.

14.     Plaintiffs sponsor a group health plan and are forced under the Mandate to conduct business in a manner that violates their religious faith by providing and funding abortion, sterilization, contraception, and abortifacients, which violates deeply held religious beliefs.

15.     Plaintiffs bring this action to vindicate not only their own rights, but also to protect the rights of all Americans who care about our Constitutional guarantees of free exercise of religion and their freedom of speech, as well as *the protection of innocent human life*.

## JURISDICTION AND VENUE

16.     This action in which the United States is a defendant arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1346.

17.     Plaintiffs' claims for declaratory and preliminary and permanent injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 42 U.S.C. § 2000bb-1, and by the general legal and equitable powers of this Court.

18.     Venue is proper under 28 U.S.C. § 1391(e) because this is the judicial district in which Defendants reside and the substantial part of the acts giving rise to Plaintiffs' claims occurred.

**PLAINTIFFS**

19.     Plaintiff Electrolock Incorporated is incorporated under the laws of the State of Ohio.

20.     Plaintiff Electrolock Incorporated is located at 17930 Great Lakes Parkway, Hiram, Ohio 44234.

21.     Plaintiff Stone River Management Co. is incorporated under the laws of the State of Delaware.

22.     Plaintiff Stone River Management Co. is located at 19730 Great Lakes Parkway, Hiram, OH 44234.

23.     Plaintiff Dunstone Co. is incorporated under the laws of the State of Ohio.

24.     Plaintiff Dunstone Co. is located at 17930 Great Lakes Parkway, Hiram, OH 44234.

25.     Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co. provide services pursuant to its mission formed by Christian service and the Catholic faith.

26.     Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co. are owned and operated by devout practicing Catholics who have made it clear both orally and in writing to their employees their Catholic understanding of the sacramental sign of the marital embrace and why providing abortifacient drugs to their employees is a formal cooperation with evil in which the Church attaches the canonical penalty of excommunication "latae sententiae" by the very commission of the offense (see Paragraph 2272 of the Catechism of the Catholic Church).

27.    Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co. are family owned by father Joseph A. Williams III, son Joseph A. Williams IV, and brother Mark A. Williams.

28.    Plaintiffs dedicate their work to God and the Lord Jesus Christ.

29.    In acting out their Catholic faith, Plaintiffs donate extensively to charitable organizations, including Catholic Charities and Schools.

30.    Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co. donate approximately 10% of their before tax earnings to the Catholic Church.

31.    Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co. also directly fund religious organizations including the Apostolate for Family Consecration, Franciscan University, and the Knights of Columbus.

32.    Plaintiffs operate by their business practices, pursuant to their guiding principle— which is their faith in God—and receive grace and guidance from God in all their business practices, including Plaintiffs' selection of health insurance.

33.    Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co. are family owned and operated.

34.    Plaintiffs Joseph A. Williams III, Joseph A. Williams IV, and Mark A. Williams retain full control over Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co. and make all of the decisions for the operation and direction of Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co.

35.    Plaintiffs Joseph A. Williams III, Joseph A. Williams IV, and Mark A. Williams are the final decision makers and implementer of all matters relating to employee health

insurance for Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co.

36.     Together Plaintiffs Joseph A. Williams III, Joseph A. Williams IV, and Mark A. Williams own 100% of the stock in Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co.

37.     Plaintiffs Joseph A. Williams III, Joseph A. Williams IV, and Mark A. Williams are practicing and faithful Catholics, who follow the teachings of the Catholic faith as defined by the Magisterium (teaching authority) of the Catholic Church.

38.     Plaintiffs are guided by their religious beliefs.

39.     Plaintiffs hold religious beliefs that prevent them from participating in, paying for, training others to engage in, or otherwise supporting abortion, sterilization, contraception, and abortifacients.

40.     Plaintiffs follow the tenets of the Christian faith in their business practices.

41.     Based on the teachings of the Catholic Church, and their deeply held religious beliefs, Plaintiffs do not believe that contraception, sterilization, or abortion are properly understood to constitute medicine, health care, or a means of providing for the well being of persons.   Indeed, Plaintiffs believe these procedures involve gravely immoral practices, specifically the intentional destruction of innocent human life.   Therefore, Plaintiffs seek to exclude this objectionable coverage from their health insurance plan.

## DEFENDANTS

42.     Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing the Mandate.

8

43.     Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS").  In this capacity, she has responsibility for the operation and management of HHS.  Defendant Sebelius is sued in her official capacity only.

44.     Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

45.     Defendant Thomas Perez is the Secretary of the United States Department of Labor.  In this capacity, he holds responsibility for the operation and management of the United States Department of Labor.  Defendant Perez is sued in his official capacity only.

46.     Defendant United States Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

47.     Defendant Jack Lew is the Secretary of the United States Department of the Treasury.  In this capacity, he holds responsibility for the operation and management of the United States Department of Treasury.  Defendant Lew is sued in his official capacity only.

48.     Defendant United States Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

## FACTUAL ALLEGATIONS

**Plaintiffs' Religious Beliefs**

49.     Plaintiffs hold and actively profess religious beliefs in accordance with the traditional Catholic teachings on the sanctity of life.  Plaintiffs believe that each human being bears the image and likeness of God, and therefore that all human life is sacred and precious,

from the moment of conception.  Plaintiffs therefore believe that abortion ends a human life and is a grave sin.

50.     Furthermore, Plaintiffs subscribe to or agree with Catholic teaching about the proper nature and aims of health care and medical treatment.  For instance, Plaintiffs believe, in accordance with Pope John Paul II's 1995 encyclical *Evangelium Vitae*, that "'[c]ausing death' can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life."

51.     Several leaders within the Catholic Church have publicly spoken out about how the Mandate is a direct violation of Catholic Faith.

52.     Cardinal Timothy Dolan, Archbishop of New York and President of the United States Conference of Catholic Bishops wrote, "Since January 20 [2012], when the final, restrictive HHS Rule was first announced, we have become certain of two things: *religious freedom* is under attack, and we will not cease our struggle to protect it.  We recall the words of our Holy Father Benedict XVI to our brother bishops on their recent *ad limina* visit: 'Of particular concern are certain attempts being made to limit that most cherished of American freedoms, the freedom of religion.' . . . We have made it clear in no uncertain terms to the government that we are not at peace with its invasive attempt to curtail the *religious freedom* we cherish as Catholics and Americans." (http://www.usccb.org/issues-and-action/religious-liberty/hhs-mandate/index.cfm, last visited Sept. 3, 2013).

53.     Archbishop Charles J. Chaput, the Archbishop of Philadelphia, has expressed that the Affordable Care Act and the Mandate seek "to coerce Catholic employers, private and corporate, to violate their religious convictions . . . [t]he HHS mandate, including its latest variant, is belligerent, unnecessary, and deeply offensive to the content of Catholic belief . . . The

HHS mandate needs to be rescinded. In reality, no similarly aggressive attack on religious freedom in our country has occurred in recent memory . . . [t]he HHS mandate is bad law; and not merely bad, but dangerous and insulting. It needs to be withdrawn—now." (http://the-american-catholic.com/2012/02/14/archbishop-chaput-hhs-mandate-dangerous-and-insulting/, last visited Sept. 3, 2013).

**Plaintiffs Electrolock Incorporated, Stone River Management Co., Dunstone Co., Joseph A. Williams III, Joseph A. Williams IV, and Mark A. Williams**

54.    Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co. are for-profit companies.

55.    All Plaintiffs share a common mission of conducting their business operations with integrity and in compliance with the teachings, mission, and values of the Catholic faith.

56.    Plaintiffs provide group insurance through insurance issuer Humana Health Insurance, and provide this insurance to their employees.

57.    Plaintiffs specifically chose Humana Health Insurance due to its exclusion of abortion coverage prior to the Mandate.

58.    Plaintiffs now have organized a self-insured employee group health plan, which they seek to implement which expressly excludes abortion, sterilization, contraception, abortifacients or related education and counseling, and does not violate Plaintiffs' deeply held religious beliefs.

59.    Plaintiffs strive to provide their employees with employee health coverage superior to coverage generally available in the national market in order to be a competitive employer.

60.   Plaintiffs cannot provide, fund, or participate in health care insurance which covers abortion, sterilization, contraceptives, or abortifacients, or related education and counseling, without violating their deeply held religious beliefs.

61.   Plaintiffs cannot provide information or guidance to their employees regarding abortion, sterilization, contraception, abortifacients or related education and counseling, without violating their deeply held religious beliefs.

62.   With full knowledge of these aforementioned beliefs, Defendants issued an administrative rule ("the Mandate") that runs roughshod over Plaintiffs' religious beliefs, and the beliefs of millions of other Americans.

63.   The Mandate not only forces Plaintiffs to finance abortion, sterilization, contraception, and abortifacients, and related education and counseling as health care, but also subverts the expression of Plaintiffs' religious beliefs, and the beliefs of millions of other Americans, by forcing Plaintiffs to fund, promote, and assist others to acquire services which Plaintiffs believe involve gravely immoral practices, including the destruction of innocent human life.

64.   The Mandate unconstitutionally coerces Plaintiffs to violate their deeply-held religious beliefs under threat of directly violating their consciences, in addition to any imposed fines and penalties.  The Mandate also forces Plaintiffs to fund government-dictated speech that is directly at odds with their own speech and religious beliefs.  Being entirely forced out of the insurance market in order to ensure the privilege of practicing one's religion or controlling one's own speech substantially burdens Plaintiffs' religious liberty and freedom of speech under the First Amendment.

65.   The Mandate strips the Plaintiffs of any choice to select an insurance plan that does not cover and finance abortion, sterilization, contraception, and abortifacients, as the Mandate requires that all insurance issuers provide this coverage.

66.   Plaintiffs' plan is not considered "grandfathered" and is subject to the provisions of the Mandate.

67.   Due to the Mandate, Plaintiffs are not allowed to exclude contraception, abortion, sterilization, contraception, and abortifacients from their insurance plan—and are now being forced to provide and pay for these services which violate their religious beliefs.

68.   Plaintiffs intend to conduct their business in a manner that does not violate the principles of their religious faith.

69.   Complying with the Mandate requires a direct violation of the Plaintiffs' religious beliefs because it requires Plaintiffs to pay for and assist others in paying for or obtaining abortion, because contraceptive and abortifacient drugs and devices including the "morning-after pill," "Plan B," and "ella" come within the Mandate's and Health Resources and Services Administration's definition of "Food and Drug Administration-approved contraceptive methods" despite their known abortifacient mechanisms of action.

70.   Defendants' refusal to accommodate the conscience of the Plaintiffs, and of other Americans who share the Plaintiffs' religious views, is highly selective.  Numerous exemptions exist in the Affordable Care Act which appear arbitrary and were granted to employers who purchase group insurance.  This evidences that Defendants do not mandate that all insurance plans need to cover "preventive services" (e.g. the thousands of waivers from the Affordable Care Act issued by Defendants for group insurance based upon the commercial convenience of large corporations and the age of the insurance plan).

71.     Despite granting waivers upon a seemingly arbitrary basis, no exemption exists for an employer or individual whose religious conscience instructs him that certain mandated services are unethical, immoral, and volatile to one's religious beliefs.   Defendants' plan fails to give the same level of weight or accommodation to the exercise of one's fundamental First Amendment freedoms that it assigns to the yearly earnings of a corporation or arbitrary guidelines of exemption, such as the age of the plan.

72.     The Defendants' actions violate Plaintiffs' right to freedom of religion, as secured by the First Amendment to the United States Constitution and civil rights statutes, including the Religious Freedom Restoration Act (RFRA).

73.     The Defendants' actions also violate Plaintiffs' right to the freedom of speech, as secured by the First Amendment to the United States Constitution.

74.     Furthermore, the Mandate is also illegal because it was imposed by Defendants without prior notice or sufficient time for public comment, and otherwise violates the Administrative Procedure Act, 5 U.S.C. § 553.

75.     Had Plaintiffs' religious beliefs, or the beliefs of the millions of other Americans who share Plaintiffs' religious beliefs been obscure or unknown, the Defendants' actions might have been an accident.   But because the Defendants acted with full knowledge of those beliefs, and because they arbitrarily exempt some plans for a wide range of reasons other than religious conviction, the Mandate can be interpreted as nothing other than a deliberate attack by the Defendants on Christianity, the religious beliefs held by Plaintiffs and the similar religious beliefs held by millions of other Americans.   The Defendants have, in sum, intentionally used government power to force individuals to believe in, support, and endorse the mandated services manifestly contrary to their own religious convictions, and then to act on that coerced belief,

14

support, or endorsement.  Plaintiffs seek declaratory and injunctive relief to protect against this attack.

**The Affordable Care Act**

76.    In March 2010, Congress passed, and President Obama signed into law, the "Patient Protection and Affordable Care Act" (Pub. L. 111-148, March 23, 2010, 124 Stat. 119) and the "Health Care and Education Reconciliation Act" (Pub. L. 111-152, March 30, 2010, 124 Stat. 1029) (referred to in this complaint as the "Affordable Care Act").

77.    The Affordable Care Act regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

78.    The Affordable Care Act does not apply equally to all insurers.

79.    The Affordable Care Act does not apply equally to all individuals.

80.    Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co. constitute a "single employer" for purposes of the Affordable Care Act as defined at 42 U.S.C. § 18024(b)(4)(A).

81.    Plaintiffs Electrolock Incorporated, Stone River Management Co., and Dunstone Co., as well as Plaintiffs Joseph A. Williams III, Joseph A. Williams IV, and Mark A. Williams, the sole owners, must provide federal government-approved health insurance under the Affordable Care Act.

82.    Certain provisions of the Affordable Care Act do not apply equally to members of certain religious groups. *See, e.g.,* 26 U.S.C. § 5000A(d)(2)(A)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(B)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

83.     Plaintiffs do not qualify for an individual exemption under 26 U.S.C. § 5000A(d)(2)(A)(i) and (ii) as Plaintiffs do not object to acceptance of public or private insurance funds in their totality and currently employ health insurance benefits that, prior to the Mandate, excluded contraceptives, sterilization, abortion and abortifacients.

84.     The Affordable Care Act's preventive care requirements do not apply to employers who provide so-called "grandfathered" health care plans.

85.     Employers who follow HHS' guidelines may continue to use grandfathered plans indefinitely.

86.     Plaintiffs' current insurance plans do not qualify as "grandfathered" health care plans, and are considered "non-grandfathered."

87.     Furthermore, Plaintiffs do not qualify for the "religious employer" exemption contained in 45 CFR § 147.130 (a)(1)(A) and (B).

88.     There have been changes made to Plaintiffs' plan after March 23, 2010, and participants have never been notified of a "grandfathered" status.

89.     Furthermore Plaintiffs are not eligible for "grandfathered" status under the Affordable Care Act and are subject to the requirements of the Affordable Care Act and the Health and Human Services Mandate because: (1) the health care plan does not include the required "disclosure of grandfather status" statement; (2) Plaintiffs do not take the position that its health care plan is a grandfathered plan and thus does not maintain the records necessary to verify, explain, or clarify its status as a grandfathered plan nor will it make such records available for examination upon request; and (3) the health care plan has an increase in a percentage cost-sharing requirement measured from March 23, 2010. *See* 42 U.S.C. § 18011(a) (2); 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. §147.140.

90.     Since the Plaintiffs do not qualify for the "religious employer" exemption, they are not permitted to take advantage of the "temporary safe-harbor" as set forth by the Defendants at 77 Fed. Reg. 8725 (Feb. 15, 2012), or the non-profit accommodation as set forth by the Defendants at 78 Fed. Reg. at 39,870-99.

91.     Plaintiffs are thus subjected to the Mandate now and are confronted with choosing between complying with its requirements in violation of their religious beliefs or violating federal law.

92.     Plaintiffs must choose between complying with the requirements of the Affordable Care Act in violation of their religious beliefs by providing insurance that mandates abortions or terminating its insurance plan, which would have a crippling impact on their ability to survive economically and send the company into bankruptcy.

93.     Plaintiffs are collectively confronted with complying with the requirements of the Affordable Care Act in violation of their religious beliefs or removing themselves and employees from the health insurance market in its entirety—endangering the health and economic stability of their employees and forcing Plaintiffs to be non-competitive as employers in a market where other, non-Catholic employers will be able to provide insurance to their employees under the Affordable Care Act without violating their religious beliefs.

94.     Plaintiffs had originally planned to stop insurance all together and give several thousand dollars to each employee, so their employees could purchase individual insurance with the exchanges.   Plaintiffs' employees have tried to use Defendants' website to obtain insurance—without any success and with much consternation and frustration.

95.     Due to the negative effects of not providing insurance and Plaintiffs' Christian views and devotion to Christian Stewardship, they need to provide for their employees and not

subject their employees to hardship.  Plaintiffs need to continue providing insurance not only to remain competitive as an employer, but to responsibly take care of their employees.

96.  The Affordable Care Act is not generally applicable because it provides for numerous exemptions from its rules.

97.  The Affordable Care Act is not neutral because some groups, both secular and religious, enjoy exemptions from the law, while certain religious groups do not.  Some groups, both secular and religious, have received waivers from complying with the provisions of the Affordable Care Act, while others—such as the Plaintiffs—have not.

98.  The Affordable Care Act creates a system of individualized exemptions.

99.  The United States Department of Health and Human Services has the authority under the Affordable Care Act to grant compliance waivers ("HHS waivers") to employers and other health insurance plan issuers.

100.  HHS waivers release employers and other plan issuers from complying with the provisions of the Affordable Care Act.

101.  HHS decides whether to grant waivers based on individualized waiver requests from particular employers and other health insurance plan issuers.

102.  Upon information and belief, more than a thousand HHS waivers have been granted.

**The "Preventive Care" Mandate**

103.  A provision of the Affordable Care Act mandates that health plans "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" and directs the Secretary of

18

United States Department of Health and Human Services to determine what would constitute "preventive care" under the mandate. 42 U.S.C § 300gg–13(a)(4).

104.    On July 19, 2010, HHS, along with the United States Department of Treasury and the United States Department of Labor, published an interim final rule under the Affordable Care Act. 75 Fed. Reg. 41726 (2010).   The interim final rule required providers of group health insurance to cover preventive care for women as provided in guidelines to be published by the Health Resources and Services Administration at a later date. 75 Fed. Reg. 41759 (2010).

105.    On February 15, 2012, the United States Department of Health and Human Services promulgated a mandate that group health plans include coverage for all Food and Drug Administration-approved contraceptive methods and procedures, patient education, and counseling for all women with reproductive capacity in plan years beginning on or after August 1, 2012 (hereafter, "the Mandate"). *See* 45 CFR § 147.130 (a)(1)(iv), as confirmed at 77 Fed. Register 8725 (Feb. 15, 2012), adopting and quoting Health Resources and Services Administration (HRSA) Guidelines, (http://www.hrsa.gov/womensguidelines, last visited Sept. 3, 2013).

106.    The Mandate was enacted pursuant to statutory authority under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, as amended by the Health Care and Education Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (ACA). 77 Fed. Reg. 31, 8725 ("Affordable Care Act").

107.    In its ruling, HHS included all FDA-approved contraceptives under the banner of preventive services, including sterilization, contraception, abortion, and abortifacients such as the "morning-after pill," "Plan B," and "ella," a close cousin of the abortion pill RU-486. (http://www.hrsa.gov/womensguidelines, last visited Sept. 3, 2013).

108.    The Mandate's reach seeks to control the decisions of employers, individuals and also the decisions of *all* insurance issuers (i.e. self-insured plans, Humana Health Insurance, etc.).  42 USC § 300gg-13 (a)(1),(4). ("A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force; . . . with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.").

109.    *All* insurance issuers are mandated to include contraception, sterilization, abortion, and abortifacients such as the "morning-after pill," "Plan B," and "ella" in *all* of its group *and* individual plans, not specifically exempted, beginning as of August 1, 2012 and effective on the anniversary of the employer's plan year.

110.    Individuals and employers, regardless of the number of employees they employ, are forced to select an insurance plan which includes what HHS deemed "preventive care."

111.    All individuals and employers are now stripped of their choice not to pay for the "preventive care," regardless of whether paying for such "services" violates one's conscience or deeply held religious beliefs.

112.    Health insurance issuers include insurance companies such as self-insured companies and Humana Health Insurance, which are insurance issuers used by Plaintiffs.

113.    The Mandate reaches even further than the Affordable Care Act to eliminate all employers and individuals from selecting a health insurance plan in which the insurance issuers do not automatically provide contraception, abortion, sterilization, and abortifacients.

114.    Prior to promulgating the Mandate, HHS accepted public comments to the 2010 interim final regulations from July 19, 2010 to September 17, 2010.   Upon information and belief, a large number of groups filed comments, warning of the potential conscience implications of requiring religious individuals and groups to pay for certain kinds of services, including contraception, abortion, sterilization, and abortifacients.

115.    HHS directed a private health policy organization, the Institute of Medicine ("IOM"), to suggest a list of recommended guidelines describing which drugs, procedures, and services should be covered by all health plans as preventive care for women. (http://www.hrsa.gov/womensguidelines, last visited Sept. 3, 2013).

116.    In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans.  These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood    Federation    of    America    and    Sara    Rosenbaum. (http://www.nap.edu/openbook.php?record_id=13181&PAGE=217, last visited Sept. 3, 2013).

117.    No religious groups or other groups that oppose government-mandated coverage of contraception, abortion, sterilization, and related education and counseling were among the invited presenters.

118.    One year after the first interim final rule was published, on July 19, 2011, the IOM published its recommendations.  It recommended that the preventive services include "All Food and Drug Administration approved contraceptive methods."   (Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps (July 19, 2011)).

119.    Preventive services therefore include FDA-approved contraceptive methods such as birth-control pills; prescription contraceptive devices, including IUDs; Plan B, also known as the "morning-after pill"; and ulipristal, also known as "ella" or the "week-after pill"; and other drugs, devices, and procedures.

120.    Plan B and "ella" can prevent the implantation of a human embryo in the wall of the uterus and can cause the death of an embryo.  The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus or to cause the death of an embryo each constitute an "abortion" as that term is used in federal law and Catholic teaching.  Consequently, Plan B and "ella" are abortifacients.

121.    Thirteen days later, on August 1, 2011, without notice of rulemaking or opportunity for public comment, HHS, the United States Department of Labor, and the United States Department of Treasury adopted the IOM recommendations in full and promulgated an interim final rule ("the Mandate"), which requires that all "group health plan[s] and . . . health insurance issuer[s] offering group or individual health insurance coverage" provide all FDA-approved contraceptive methods and procedures. 76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130.  Health Resources and Services Administration issued guidelines adopting the IOM recommendations.  (http://www.hrsa.gov/womensguidelines, last visited Sept. 3, 2013).

122.    The Mandate also requires group health care plans and insurance issuers to provide education and counseling for all women beneficiaries with reproductive capacity.

123.    The Mandate went into effect immediately as an "interim final rule."

124.    HHS did not take into account the concerns of religious organizations in the comments submitted before the Mandate was issued.

125.   Instead the Mandate was unresponsive to the concerns stated in the comments submitted by religious organizations.

126.   When it issued the Mandate, HHS requested comments from the public by September 30th and indicated that comments would be available online.

127.   Upon information and belief, over 100,000 comments were submitted against the Mandate.

128.   On October 5, 2011, six days after the comment period ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America.  She told the assembled crowd that "we are in a war." She did not state whom she and NARAL Pro-Choice America were warring against.

129.   During a Congressional hearing on April 26, 2012, Defendant Sebelius admitted that she is totally unfamiliar with the United States Supreme Court religious freedom cases.

130.   Defendant Sebelius showed little concern for the constitutional issues involved in promulgating the Mandate.  At the aforementioned congressional hearing, she admitted that prior to issuing the Mandate she did not review any written materials or any sort of legal memo from her general counsel discussing the effects of the Mandate on religious freedom.

131.   The Mandate fails to take into account the statutory and constitutional conscience rights of religious business owners and for profit companies that exercise business practices in compliance with certain faith practices, such as Plaintiffs, a subject of comment.

132.   The Mandate requires that Plaintiffs assist, provide, or fund coverage for abortion, abortifacients, sterilization, and related education and counseling against its conscience in a manner that is contrary to law.

133.    The Mandate constitutes government-imposed pressure and coercion on Plaintiffs to change or violate their religious beliefs.

134.    The Mandate exposes Plaintiffs, as individuals and as employers, to substantial fines.

135.    Employers with fewer than 50 employees who purchase insurance for their employees from health insurance issuers are subject to the Affordable Care Act.  42 USC § 300GG-13 (a)(1),(4).

136.    As an employer with less than 50 full-time employees if Plaintiffs provide insurance which conforms to their religious beliefs but not to the Mandate, Plaintiffs face penalties of $100 a day per employee.

137.    Under the United States Internal Revenue Code, 26 U.S.C. § 4980D(a), there is a tax imposed on any failure of a group plan to meet the requirements of Chapter 100 (relating to group plan requirements).  Under 26 U.S.C. § 4980D(b), the amount of the tax is $100 for each day in the non-compliance period with respect to each individual to whom such failure relates. This tax penalty would generally be: 43 employees x 365 days per year x $100 each day = $1,569,500 penalty per tax year.

138.    The Mandate imposes a burden on Plaintiffs' employee recruitment and retention efforts by creating uncertainty as to whether Plaintiffs will continue to offer health insurance.

139.    The Mandate places Plaintiffs at a competitive disadvantage in their efforts to recruit and retain employees.

140.    Furthermore, as a Catholic and as a Catholic run business, Plaintiffs' religious beliefs and the principle of stewardship require that Plaintiffs care for their employees by providing insurance coverage for them and their families.

141.   The Mandate forces Plaintiffs to provide, fund, or approve and assist its employees and members in purchasing and providing sterilization, contraception, abortion, and abortifacient drugs in violation of Plaintiffs' religious beliefs that doing so is gravely immoral and equivalent to assisting another to destroy innocent human life.

142.   Plaintiffs have a sincere religious objection to providing coverage for emergency contraceptive drugs such as Plan B and "ella" since they believe those drugs could prevent a human embryo, which they understand to include a fertilized egg before it implants in the uterus, from implanting in the wall of the uterus, causing the death of a person.

143.   Plaintiffs consider the prevention by artificial means of the implantation of a human embryo to be an abortion.

144.   Plaintiffs believe that Plan B and "ella" can cause the death of the embryo, which is a person.

145.   Plan B can prevent the implantation of a human embryo in the wall of the uterus.

146.   "Ella" can prevent the implantation of a human embryo in the wall of the uterus.

147.   Plan B and "ella" can cause the death of the embryo.

148.   The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus constitutes an "abortion" as that term is used in federal law.

149.   The use of artificial means to cause the death of a human embryo constitutes an "abortion" as that term is used in federal law.

150.   The Mandate forces Plaintiffs to provide emergency contraception, including Plan B and "ella," free of charge, regardless of the ability of insured persons to obtain these drugs from other sources.

151.    The Mandate forces Plaintiffs to fund education and counseling concerning abortion that directly conflicts with Plaintiffs' religious beliefs and teachings.

152.    Plaintiffs could not cease in providing its employees with health insurance coverage without violating its religious duty to provide for the health and well-being of its employees and their families.   Additionally, employees would be unable to attain similar coverage in the market as it now exists.

153.    The Mandate forces Plaintiffs to choose between violating their religious beliefs, incurring substantial fines, or terminating their employee or individual health insurance coverage.

154.    Providing counseling and education about abortion directly undermines and subverts the explicit messages and speech of Plaintiffs.

155.    Group health plans and insurance issuers have been subject to the Mandate as of August 1, 2012.

156.    Plaintiffs' plan year begins on July 1 of each year, and has been subject to the Mandate as of July 1, 2013.

157.    Plaintiffs have already had to devote significant institutional resources, including both staff time and funds, to determine how to respond to the Mandate, and Plaintiffs anticipate continuing to make such expenditures of time and money.

**The Narrow and Discretionary Religious Exemption and Exemption for Non-profit Corporations**

158.    The Mandate indicates that the Health Resources and Services Administration ("HRSA") "may" grant religious exemptions to certain religious employers. 45 C.F.R. § 147.130(a)(iv)(A).

159.    The Mandate allows HRSA to grant exemptions for "religious employers" who "meet [ ] all of the following criteria: (1) The inculcation of religious values is the purpose of the organization. (2) The organization primarily employs persons who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the organization. (4) The organization is a *nonprofit* organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.130(a)(iv)(B).

160.    The Mandate imposes no constraint on HRSA's discretion to grant exemptions to some, all, or none of the organizations meeting the Mandate's definition of "religious employers."

161.    HHS stated that it based the exemption on comments on the 2010 interim final rule. 76 Fed. Reg. 46621.

162.    Defendants also have made an accommodation for non-profit corporations who do not fit within the narrow definition of a religious employer, but oppose providing insurance coverage for contraceptives, sterilization, abortifacients, and abortion. (http://www.ofr.gov/OFRUpload/OFRData/2013-15866_PI.pdf, last visited Sept. 3, 2013).

163.    There is *no* exemption for a *for-profit* company.

164.    Plaintiffs are subject to the Mandate despite the existence of exemptions to the Mandate as none of the exemptions apply to Plaintiffs.

165.    On January 20, 2012, Defendant Sebelius announced that there would be no change to the religious exemption.  She added that "[n]onprofit employers who, based on religious beliefs, do not currently provide contraceptive coverage in their insurance plan, will be provided an additional year, until August 1, 2013, to comply with the new law," on the condition

that those employers certify they qualify for the extension. At the same time, however, Sebelius announced that HHS "intend[s] to require employers that do not offer coverage of contraceptive services to provide notice to employees, which will also state that contraceptive services are available at sites such as community health centers, public clinics, and hospitals with income-based support." *See* Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, (http://www.hhs.gov/news/press/2012pres/01/20120120a.html, last visited Sept. 3, 2013). To date, Defendant HHS has not released any official rule implementing either the one-year extension or the additional forced-speech requirement that applies to either Plaintiff.

166. Plaintiffs are currently subject to the Mandate, despite the fact that Plaintiffs will violate the teachings of their religious beliefs and the teachings of their Christian faith by directly providing, funding, and/or allowing its members to engage in disseminating information and guidance about where to obtain abortion, or abortifacient services.

## CLAIMS

### COUNT I
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

167. Plaintiffs incorporate by reference all preceding paragraphs.

168. Plaintiffs' sincerely held religious beliefs prohibit it from providing coverage for abortifacients, contraceptives, sterilization, and abortion, or related education and counseling. Plaintiffs' compliance with these beliefs is a religious exercise.

169. Neither the Affordable Care Act nor the Mandate is neutral.

170. Neither the Affordable Care Act nor the Mandate is generally applicable.

171. Defendants have created categorical exemptions and individualized exemptions to the Mandate.

28

172.    The Mandate furthers no compelling governmental interest.

173.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

174.    The Mandate creates government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

175.    The Mandate chills Plaintiffs' religious exercise.

176.    The Mandate exposes Plaintiffs to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance.

177.    The Mandate exposes Plaintiffs to substantial fines for their religious exercise.

178.    The Mandate exposes Plaintiffs to monetary and health risks as they will no longer be able to accept health insurance, nor be able to purchase or provide health care insurance without violating their religious beliefs.

179.    The Mandate imposes a substantial burden on Plaintiffs' religious exercise.

180.    The Mandate is not narrowly tailored to any compelling governmental interest.

181.    The Mandate and Defendants' threatened enforcement of the Mandate violate Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment to the United States Constitution.

182.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT II
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

183.    Plaintiffs incorporate by reference all preceding paragraphs.

184.    Plaintiffs' sincerely held religious beliefs prohibit them from purchasing or providing coverage for abortifacients, contraceptives, sterilization, abortion, or related education and counseling.  Plaintiffs' compliance with these beliefs is a religious exercise.

185.    Despite being informed in detail of these beliefs beforehand, Defendants designed the Mandate and the religious exemption to the Mandate in a way that made it impossible for Plaintiffs to comply with their religious beliefs.

186.    Defendants promulgated both the Mandate and the religious exemption to the Mandate in order to suppress the religious exercise of Plaintiffs and others.

187.    The Mandate and Defendants' threatened enforcement of the Mandate thus violate Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

188.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

### COUNT III
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

189.    Plaintiffs incorporate by reference all preceding paragraphs.

190.    By design, Defendants imposed the Mandate on some religious organizations or religious individuals but not on others, resulting in discrimination among religions.

191.    The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

192.    The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no religious individuals.

193.    The Mandate and Defendants' threatened enforcement of the Mandate thus violate Plaintiffs' rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

194.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

**COUNT IV**
**Violation of the First Amendment to the United States Constitution**
**Establishment Clause**

195.    Plaintiffs incorporate by reference all preceding paragraphs.

196.    By design, defendants imposed the Mandate on some religious organizations but not on others, resulting in a selective burden on Plaintiffs.

197.    Defendants also imposed the Mandate on some religious individuals and religious organizations but not on others, resulting in a selective burden on Plaintiffs.

198.    The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

199.    The Mandate also vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no individuals.

200.    The Mandate and Defendants' threatened enforcement of the Mandate therefore violates Plaintiffs' rights secured to it by the Establishment Clause of the First Amendment to the United States Constitution.

201.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT V
### Violation of the First Amendment to the United States Constitution
### Freedom of Speech

202.    Plaintiffs incorporate by reference all preceding paragraphs.

203.    Plaintiffs profess, educate, lecture, and engage in outreach amongst the community that abortion, contraception, sterilization, and abortifacients violate their religious beliefs.

204.    The Mandate would compel Plaintiffs to provide or subsidize activities that Plaintiffs profess, educate, lecture, and engage in outreach amongst the community are violations of the Plaintiffs' religious beliefs.

205.    The Mandate would compel Plaintiffs to fund and to provide education and counseling related to abortion, sterilization, contraception, and abortifacients.

206.    Defendants' actions thus violate Plaintiffs' right to be free from compelled speech as secured to it by the First Amendment of the United States Constitution.

207.    The Mandate's compelled speech requirement is not narrowly tailored to a compelling governmental interest.

208.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT VI
### Violation of the First Amendment to the United States Constitution
### Expressive Association

209.    Plaintiffs incorporate by reference all preceding paragraphs.

210.    Plaintiffs profess, educate, and engage in outreach amongst the community that abortion, contraception, sterilization, and abortifacients violate their religious beliefs.

211.    The Mandate would compel Plaintiffs to subsidize activities that Plaintiffs profess, educate, and engage in outreach in the community are violations of Plaintiffs' religious beliefs.

212.    The Mandate would compel Plaintiffs to fund and to provide education and counseling related to abortion, contraception, sterilization, and abortifacients.

213.    Defendants' actions thus violate Plaintiffs' right of expressive association as secured to it by the First Amendment of the United States Constitution.

214.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

### COUNT VII
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause and Freedom of Speech

215.    Plaintiffs incorporate by reference all preceding paragraphs.

216.    By stating that HRSA "may" grant an exemption to certain religious groups, the Mandate vests HRSA with unbridled discretion over which organizations or individuals can have its First Amendment interests accommodated.

217.    The Mandate furthermore seems to have completely failed to address the constitutional and statutory implications of the Mandate on for-profit employers such as Plaintiffs.  As such, Plaintiffs are subject to the unbridled discretion of HRSA to determine whether such companies would be exempt or are wholly left without relief from the Mandate.

218.    Defendants' actions violate Plaintiffs' right not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to it by the First Amendment of the United States Constitution.

219.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT VIII
### Violation of the Religious Freedom Restoration Act

220.    Plaintiffs incorporate by reference all preceding paragraphs.

221.    Plaintiffs' sincerely held religious beliefs prohibit it from providing or purchasing coverage for abortion, contraception, sterilization, abortifacients, or related education and counseling.  Plaintiffs' compliance with these beliefs is a religious exercise.

222.    The Mandate creates government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

223.    The Mandate chills Plaintiffs' religious exercise.

224.    The Mandate exposes Plaintiffs to substantial fines for their religious exercise.

225.    The Mandate exposes Plaintiffs to substantial competitive disadvantages, in that it will no longer be permitted to offer or purchase health insurance.

226.    The Mandate imposes a substantial burden on Plaintiffs' religious exercise.

227.    The Mandate furthers no compelling governmental interest.

228.    The Mandate is not narrowly tailored to any compelling governmental interest.

229.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

230.    The Mandate and Defendants' threatened enforcement of the Mandate violate Plaintiffs' rights secured to it by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

231.    Absent injunctive and declaratory relief against the Defendants, Plaintiffs have been and will continue to be harmed.

## COUNT IX
### Violation of the Administrative Procedure Act

232.    Plaintiffs incorporate by reference all preceding paragraphs.

233.    Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute "good cause."

234.    Without proper notice and opportunity for public comment, Defendants were unable to take into account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented."  Defendants did not consider or respond to the voluminous comments they received in opposition to the interim final rule.

235.    Therefore, Defendants have taken agency action not in observance with procedures required by law, and Plaintiffs are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

236.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT X
### Violation of the Administrative Procedure Act

237.    Plaintiffs incorporate by reference all preceding paragraphs.

238.    In promulgating the Mandate, Defendants failed to consider the constitutional and statutory implications of the mandate on Plaintiffs and similar organizations, companies, and individuals.

239.    Defendants' explanation for its decision not to exempt Plaintiffs and similar companies and religious individuals from the Mandate runs counter to the evidence submitted by religious organizations during the comment period.

240.     Thus, Defendants' issuance of the interim final rule was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the rules fail to consider the full extent of their implications and they do not take into consideration the evidence against them.

241.     Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT XI
### Violation of the Administrative Procedure Act

242.     Plaintiffs incorporate by reference all preceding paragraphs.

243.     The Mandate is contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (September 30, 2008).

244.     The Weldon Amendment provides that "[n]one of the funds made available in this Act [making appropriations for Defendants United States Department of Labor and United States Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

245.     The Mandate requires issuers, employers, and individuals, including Plaintiffs, to provide and purchase coverage of all Federal Drug Administration-approved contraceptives.

246.     Some FDA-approved contraceptives cause abortions.

247.     As set forth above, the Mandate violates RFRA and the First Amendment.

248.     Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law, and is in violation of the Administrative Procedure Act.

249.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT XII
### Violation of the Administrative Procedure Act

250.    Plaintiffs incorporate by reference all preceding paragraphs.

251.    The Mandate is contrary to the provisions of the Affordable Care Act.

252.    Section 1303(a)(1)(A)(i) of the Affordable Care Act states that "nothing in this title"—i.e., title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

253.    Section 1303 further states that it is "the issuer" of a plan that "shall determine whether or not the plan provides coverage" of abortion services.

254.    Under the Affordable Care Act, Defendants do not have the authority to decide whether a plan covers abortion; only the issuer does.

255.    However, the Mandate requires all issuers provide coverage of all Federal Drug Administration-approved contraceptives.

256.    Some FDA-approved contraceptives cause abortions.

257.    Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law, and is in violation of the Administrative Procedure Act.

258.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a.      Declare that the Mandate and Defendants' enforcement of the Mandate against Plaintiffs violates the First Amendment to the United States Constitution;

b.      Declare that the Mandate and Defendants' enforcement of the Mandate against Plaintiffs violates the Religious Freedom Restoration Act;

c.      Declare that the Mandate was issued in violation of the Administrative Procedure Act;

d.      Issue both a preliminary and a permanent injunction prohibiting and enjoining Defendants from enforcing the Mandate against Plaintiffs and other religious individuals, employers, and companies that object to funding and providing insurance coverage for abortion, contraception, sterilization, abortifacients, and related education and counseling;

e.      Award Plaintiffs the costs of this action and reasonable attorney's fees; and

f.      Award such other and further relief as it deems equitable and just.

Respectfully submitted,

THOMAS MORE LAW CENTER

 /s/   Erin Elizabeth Mersino
Erin Elizabeth Mersino, Esq.
(D.C. Court Bar No. MI 0060)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, Michigan 48106
Tel (734) 827-2001
Fax (734) 930-7160
emersino@thomasmore.org

*Counsel for Plaintiffs*

## VERIFICATION

I, Joseph A. Williams III, declare as follows:

1.   I am an owner of Electrolock Incorporated, Stone River Management Co., and Dunstone Co.

2.   I have personal knowledge of Electrolock Incorporated, Stone River Management Co., and Dunstone Co.and its activities, including those set out in the foregoing *Complaint*, and if called upon to testify I would competently testify as to the matters stated herein.

3.   I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Complaint* concerning Electrolock Incorporated, Stone River Management Co., and Dunstone Co. and my activities are true and correct.  Executed on October 30, 2013.

WENDY MAYS
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
January 31, 2015
Recorded in
Cuyahoga County

Joseph A. Williams III
Electrolock Incorporated, Stone River
Management Co., and Dunstone Co.

Subscribed and sworn to before me
This 30th day of October, 2013

Name of Notary
County, State
My Commission Expires:
Acting in (Name of) County

**VERIFICATION**

I, Joseph A. Williams IV, declare as follows:

    1.      I am an owner of Electrolock Inc and Dunstone Co.

    2.      I have personal knowledge of Electrolock Inc and Dunstone Co. and its activities, including those set out in the foregoing *Complaint*, and if called upon to testify I would competently testify as to the matters stated herein.

    3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Complaint* concerning Electrolock Inc and Dunstone Co., Inc and my activities are true and correct.  Executed on October 30, 2013.

WENDY MAYS
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
January 31, 2015
Recorded in
Cuyahoga County

Joseph A. Williams IV
Electrolock Incorporated and Dunstone Co.

Subscribed and sworn to before me
This 30th day of October, 2013

Name of Notary
County, State
My Commission Expires:
Acting in (Name of) County

40

## VERIFICATION

I, Mark A. Williams, declare as follows:

1.     I am an owner of Electrolock Incorporated, Stone River Management Co., and Dunstone Co.

2.     I have personal knowledge of Electrolock Incorporated, Stone River Management Co., and Dunstone Co.and its activities, including those set out in the foregoing *Complaint*, and if called upon to testify I would competently testify as to the matters stated herein.

3.     I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Complaint* concerning Electrolock Incorporated, Stone River Management Co., and Dunstone Co. and my activities are true and correct.  Executed on October 30, 2013.

WENDY MAYS
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
January 31, 2015
Recorded in
Cuyahoga County

Mark A. Williams
Electrolock Incorporated, Stone River
Management Co., and Dunstone Co.

Subscribed and sworn to before me
This 30th day of October, 2013

Name of Notary
County, State
My Commission Expires:
Acting in (Name of) County

41